**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **(1) BRAD and ANDREA HUTCHISON,** | ) |
| | ) |
| **(2) NEW MEXICO CATTLE GROWERS' ASSOCIATION,** | ) |
| | ) |
| **(3) NEW MEXICO WOOL GROWERS, INC.,** | ) |
| | ) |
| **(4) NEW MEXICO FEDERAL LANDS COUNCIL,** | ) |
| | ) |
| **(5) SOUTHWEST QUAY SOIL AND WATER CONSERVATION DISTRICT,** | ) |
| | ) |
| **(6) ARCH HURLY CONSERVANCY DISTRICT,** | ) |
| | ) |
| **(7) QUAY COUNTY FARM AND LIVESTOCK BUREAU,** | ) **No. 14-CV-509-CVE-PJC** |
| | ) |
| **(8) CURRY COUNTY, NEW MEXICO**, and | ) Related Cases: |
| | ) |
| **(9) QUAY COUNTY, NEW MEXICO,** | )  No. 4:14-cv-00123-JHP-PJC |
| **Plaintiffs,** | ) |
| v. | )  No. 4:14-cv-00307-JHP-PJC |
| **(1) DEPARTMENT OF THE INTERIOR,** | ) |
| | ) |
| (2) **SALLY JEWELL,** in her official capacity as Secretary of the U.S. Department of the Interior, | ) |
| | ) **COMPLAINT FOR** |
| **(3) FISH AND WILDLIFE SERVICE**, | ) **DECLARATORY AND** |
| | ) **INJUNCTIVE RELEIF** |
| (4) **DANIEL M. ASHE,** in his official capacity as Director of the Fish and Wildlife Service, | ) |
| | ) |
| (5) **GARY FRAZER,** in his official capacity as an Assistant Director at the Fish and Wildlife Service, and | ) |
| | ) |
| (6) **DIXIE PORTER,** in her official capacity as the Field Supervisor, Oklahoma Ecological Services Field Office, Fish and Wildlife Service, Tulsa, Oklahoma, | ) |
| | ) |
| **Defendants.** | ) |

## INTRODUCTION

1.       Plaintiffs Brad and Andrea Hutchison, New Mexico Cattle Growers' Association ("NMCGA"), New Mexico Wool Growers, Inc. ("NMWG"), New Mexico Federal Lands Council ("NMFLC"), Southwest Quay Soil and Water Conservation District ("Southwest Quay SWCD"), Arch Hurley Conservancy District ("AHCD"), Quay County Farm and Livestock Bureau ("Quay County F&LB"), Curry County, New Mexico ("Curry County"), and Quay County, New Mexico ("Quay County") (collectively, the "Plaintiffs) bring this action against the United States Fish & Wildlife Service ("FWS" or "Service") seeking declaratory and injunctive relief for violations of the Endangered Species Act ("ESA") and the Administrative Procedure Act ("APA). On June 20, 2014, Plaintiffs NMCGA, NMWG, NMFLC, Southwest Quay SWCD, Quay County F&LB, Curry County and Quay County submitted a Notice of Intent to Sue, pursuant to 16 U.S.C. § 1540(g), to FWS for the violation of the ESA alleged herein. In the present suit, Plaintiffs seek relief from FWS's violations under the APA for its actions that are contrary to the ESA and the APA.

2.       This action seeks to address an agency's efforts to alter its legal obligations in the absence of Congressional action or a public rulemaking.  By entering into private settlements with special-interest litigants, FWS circumvented the legislative and regulatory process and fundamentally changed its ESA-imposed obligations.  Having been deprived of an opportunity to participate in shaping the substantive policy choices embedded in FWS's settlements, the Plaintiffs, and their members, suffer injury from FWS's implementation of the settlements' provisions in Oklahoma and New Mexico.

3.       Pursuant to the terms of the ESA, if a species "may" be warranted for listing as endangered or threatened, the FWS must commence a review of the status of the species and consider classifying such a species as either (i) "not warranted," (ii) "warranted," or (iii)

2

warranted but "precluded" by FWS's obligation of its limited resources to higher priorities.  *See* 16 U.S.C. § 1533(b)(3)(A) and (B).  A species receiving the "warranted but precluded" classification is designated as a "candidate species."

4.      The ESA and its implementing regulations mandate for each of these candidate species that, once each year, FWS must consider the same three listing alternatives: (i) listing as endangered or threatened is "not warranted," (ii) listing is "warranted" and a listing rule is proposed, or (iii) listing is "warranted but precluded" because the species at issue has a lower priority as compared to other species.  *See* 16 U.S.C. §§ 1533(b)(3)(B), (b)(3)(C)(i).

5.      The ESA also maintains benchmark standards requiring that all FWS listing decisions be grounded on the "best scientific and commercial data available," on state and private "conservation measures," and on science-driven prioritization of the candidate species. 16 U.S.C. §§ 1533(b)(l), (h).

6.      Here, FWS chose to eliminate one of the three statutory options.  Specifically, for all the 2010 candidate species, FWS eliminated a continued designation of "warranted but precluded."  Rather than pursuing this change through appropriate legislation or rulemaking efforts, FWS chose the expedient of "friendly" settlements of a series of lawsuits brought by like-minded, special-interest litigants.

7.      FWS's agreement to forego consideration of continuing a species' classification as "warranted but precluded by higher priorities" prevents voluntary measures from achieving the conservation goals that would remove the need to list a species.  Instead, by committing in the settlements to complete listing decisions for hundreds of species within the span of only a few years, FWS bound itself to make a substantive decision – probably to list the already

"warranted" species — before voluntary efforts have been given a chance to remove the threats posed to candidate species.

8.     The unlawful and harmful effects of FWS's settlements are particularly pronounced in Oklahoma and New Mexico because of the listing of the former candidate species, the Lesser Prairie-Chicken. Despite conservation efforts undertaken by the States of Oklahoma and New Mexico, and many other local counties, conservation districts and individual and industry participants, including many of the Plaintiffs, FWS purports to be compelled by its settlements to make premature decisions in violation of its obligation to rely upon the best scientific and commercial data available when listing the Lesser Prairie-Chicken   If this candidate species was assessed pursuant to provisions of the ESA, the FWS's implementing regulations, and three decades of practice, current science, and ongoing conservation efforts (including approved Candidate Conservation Agreements with Assurances ("CCAAs") might well yield a decision to continue to classify these species as candidate species.

9.     The premature listing of this species has injured and will continue to injure Plaintiffs.  Among other injuries, because the Lesser Prairie-Chicken is now listed under the ESA, Brad and Andrea Hutchison and other NMCGA, NMWG, NMFLC, Quay County F&LB and AHCD member farms and ranches will incur expenses and restrictions in order to comply with the rule accompanying the listing, to avoid a "take" in violation of the ESA, and/or to obtain incidental take permits under the ESA.  *See* 16 U.S.C. §§ l538(a), 1539(a).

10.     In order to comply with ESA take provisions and/or obtain the necessary incidental take permits to continue ranching and farming on private lands, Brad and Andrea Hutchison and other NMCGA, NMWG, NMFLC, Quay County F&LB and AHCD member farms and ranches must apply for an incidental take permit through the submission of a Habitat

Conservation Plan ("HCP). *See* 16 U.S.C. § 1539(a)(2)(A) . The preparation and submission of such a plan is likely cost prohibitive for most ranchers and farmers and may be rejected by the Service.

11.     In the alternative, Brad and Andrea Hutchison and other NMCGA, NMWG, NMFLC, Quay County F&LB and AHCD member farms and ranches within the Lesser Prairie-Chicken range may apply for and enroll in the Lesser Prairie-Chicken Range-Wide Conservation Plan or conduct ranching and farming operations under a grazing and maintenance regime developed pursuant to the Natural Resources Conservation Service ("NRCS") Lesser Prairie-Chicken Initiative ("LPCI").[1] Pursuant to the ESA's Section 4(d) rule, promulgated concurrent with the Lesser Prairie-Chicken listing rule, enrollment and compliance with the Range Wide Plan or the LPCI would give regulatory assurance against a take. *See* 79 Fed. Reg. 20,074 (Apr. 10, 2014). However, under either regime option the grazing utilization rates would be reduced by as much as thirty percent (30%) in some cases, while many other grazing and ranching practices and improvements would be wholly eliminated in areas associated with the specific life-stages of the Lesser Prairie-Chicken.

12.     In addition to restrictions on grazing utilization rates and practices, Plaintiffs Brad and Andrea Hutchison and other NMCGA, NMWG, NMFLC, Quay County F&LB and AHCD member farms and ranches will likely be burdened with increased costs and expenses associated with the construction and maintenance of the infrastructure requirements of the Section 4(d) rule and the associated NRCS Conference Report. *See* 79 Fed. Reg. 20,074; CONFERENCE REPORT, *supra* note 1, at 9.

---

[1]     *See e.g.*, U.S. FISH AND WILDLIFE SERVICE'S CONFERENCE REPORT FOR THE NATURAL RESOURCES CONSERVATION SERVICE'S LESSER PRAIRIE-CHICKEN INITIATIVE (June 30, 2011), http://www.nrcs.usda.gov/Internet/FSE_DOCUMENTS/stel/prdb1044884.pdf (last visited Aug. 22, 2014) [hereinafter "CONFERENCE REPORT"].

13.     Ultimately, compliance with the Lesser Prairie-Chicken Range-Wide Conservation Plan, the LPCI, or an HPC – necessary to realize the regulatory shelter of the Section 4(d) rule and/or continue ranching in Lesser Prairie-Chicken range – brings with it the oversight, management and/or restriction of virtually every aspect of day-to-day ranching operations and practices. *See e.g.*, CONFERENCE REPORT, *supra* note 1, at 9–16. The economic impacts will affect the viability of ranches located in the Lesser Prairie-Chicken Range, like those operated by Brad and Andrea Hutchison and other NMCGA, NMWG, NMFLC, Quay County F&LB and AHCD member ranches, and will reverberate throughout numerous rural counties and communities as the lost, or reduced, ranching revenues will further impact jobs and development.

14.     Failure to fully comply and/or mistakes in compliance could cause Brad and Andrea Hutchison and other NMCGA, NMWGNMFLC, Quay County F&LB and AHCD members to be exposed to potential criminal violations under the ESA and its implementing regulations.  *See* 16 U.S.C. § l540(b).

15.     Further, the Plaintiffs are denied the benefit of the voluntary conservation measures they have collectively or individually undertaken for the species in order to preclude its ESA listing.

16.     Finally, listing the Lesser Prairie-Chicken will, undoubtedly, increase the regulatory burden on the local county governments, such as Southwest Quay SWCD, AHCD, Curry County and Quay County, and will narrow the flexibility of local officials with regard to regulating habitat within their respective jurisdictions. For the Lesser Prairie-Chicken, the five states encompassing the bird's estimated range (including Oklahoma and New Mexico) jointly

developed the Lesser Prairie-Chicken Range-Wide Conservation Plan[2] ("Range-Wide Plan"), a voluntary conservation program formally endorsed by the FWS[3] and unprecedented in the scope of protection it affords the species and the degree of multi-disciplinary collaboration that underpins it.

17.     FWS's approval of the Range-Wide Plan and other conservation efforts, including multiple industry-wide Candidate Conservation Agreement with Assurances ("CCAA"), created the illusion that FWS was following appropriate process, good science and rational policy by giving the conservation efforts a chance for success and, therefore, eliminating the need to list the Lesser Prairie-Chicken. In fact, however, FWS remained committed to an arbitrary and aggressive listing decision deadline of March 31, 2014. Despite commitments of millions of acres and capital to the CCAAs and the likelihood that the CCAAs could preclude the need for a listing, FWS added the Lesser Prairie-Chicken to the list of "threatened" species. FWS's pre-determined decision to look past the Range-Wide Plan and CCAAs undermines support for future state-led and locally implemented voluntary conservation programs for other species.

18.     Defendants' actions are unlawful under the ESA and APA, and are actionable under the APA. First, Defendants omitted the statutory alternative of retaining the Lesser Prairie-Chicken within the candidate species classification pursuant to science-driven

---

[2]     LESSER PRAIRIE-CHICKEN INTERSTATE WORKING GROUP, THE LESSER PRAIRIE-CHICKEN RANGE-WIDE CONSERVATION PLAN (William e. VanPelt ed., Oct. 2013) http://www.wafwa.org/documents/2013LPCRWPfinalfor4drule12092013.pdf (last visited Aug. 22, 2014).

[3]     Press Release, U.S. Fish & Wildlife Serv., U.S. Fish and Wildlife Serve Endorses Western Association of Fish and Wildlife Agencies Lesser Prairie-Chicken Range-Wide Conservation Plan (Oct. 23, 2013), http://www.fws.gov/news/ShowNews.cfm?ID=E6267BFC-E38A-E402-8295AE3A5FD77DF1 (last visited Aug. 22, 2014).

priorities. Second, Defendants adopted substantive, binding policies that conflict with FWS regulations in derogation of the APA and other rulemaking procedures.

## JURISDICTION AND VENUE

19.    Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and the APA, 5 U.S.C. § 702 (judicial review of final agency action) and 16 U.S.C. § 1540(g) (citizen suits under the ESA). This Court can grant declaratory and injunctive relief under 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive relief), and 5 U.S.C. §§ 701-706, for violation of, *inter alia*, the APA, 5 U.S.C. § 706.

20.    Venue is proper in the U.S. District Court for the Northern District of Oklahoma under 28 U.S.C. §§ 1391(c)(2) and (e) in that (i) Defendant(s) reside in the Northern District of Oklahoma, maintaining an office at 9014 East 21" Street, Tulsa, Oklahoma 74129, from which FWS implements FWS policies within the State of Oklahoma and (ii) a substantial part of the events and omissions giving rise to these claims occurred in the Northern District of Oklahoma, and future regulatory impacts of FWS's listing decisions will be felt within this district.

## THE PARTIES

21.    Plaintiff Brad and Andrea Hutchison own and operate a ranch located in Major County and Dewey County, Oklahoma. The agricultural operation is centered around a cow-calf ranching operation but also produces some crops. This historic ranch lies in the heart of the Gloss Mountains and has been family owned and operated since 1923, when the first parcel was purchased. Consisting mostly of native pastures, the Brad and Andrea Hutchison are good stewards of the land and work hard to conserve water in the driest area of the county. Because Brad and Andrea Hutchison are situated within the Lesser Prairie-Chicken's range, they are likely to be directly impacted by the Service's decision to list the species as threatened.

22.     Plaintiff NMCGA was founded in 1914. It is a membership-based trade organization that represents members from all 33 of New Mexico's counties as well as 19 other states, including Oklahoma. The purposes for which NMCGA was organized are to advance and protect the cattle industry; work toward solutions to industry problems; promote the well-being of ranching and ranching families; provide an official and united voice on issues important to ranching and feeding the nation; and, to create and maintain an economic climate that will provide its' members the opportunity to obtain optimum returns on their investments within the free enterprise system. NMCGA participates in regulatory processes and litigation on behalf of all its members, including those in Oklahoma.

23.     Plaintiff NNWG is New Mexico's oldest livestock trade organization with its roots going back well over a century. The purpose of NMWG is to protect the sheep industry in the state by working on issues that affect the ability of producers to utilize and manage lands and their private property rights. The NMWG has members who are impacted by the designation of the Lesser Prairie-Chicken as a threatened species under the ESA.

24.     Plaintiff NMFLC was organized in the 1970s to provide a united front in addressing the many issues that faced New Mexicans who operate on federal and state trust lands. The NMFLC has members who are stewards of both U.S. Forest Service ("USFS") and Bureau of Land Management ("BLM") lands. Of primary concern to the members of the NMFLC is the ability to continue to utilize federal and state trust land in the production of food and fiber for the nation while continuing in the care of the natural resources, land, water and wildlife. The NMFLC has members who are directly impacted by the designation of the Lesser Prairie-Chicken as a threatened species as well as any critical habitat designation for the same.

25.     Plaintiff Southwest Quay SWCD was organized pursuant to the Soil and Water Conservation Act, N.M Stat. Ann. § 73-20-25. The purpose of the Soil and Water Conservation Act and the Southwest Quay SWCD is to conserve and develop the natural resources within the district, provide for flood control, preserve wildlife, protect the tax base and promote the health, safety and general welfare of the people of the district through application of the following measures: control and prevent soil erosion; prevent flood water and sediment damage; further the conservation, development, beneficial application, and proper disposal of water; promote the use of impounded water; and, conserve and develop the natural resources. The Board of Supervisors consists of five members, four of whom are landowners and one non-landowner who reside in the district. The Board of Supervisors represents 298 residents in the District.

26.     Plaintiff AHCD is a conservancy district located in east-central New Mexico surrounding the city of Tucumcari and located in Quay County. The ACHD includes 41,000 acres of irrigable land and provides irrigation water to over 650 family farms. ACHD irrigation project features include the Conchas Dam and Reservoir, the Conchas and Hudson Canals, and a large distribution and drainage system. Many crops grown in the project are used to sustain the local livestock industry. Among the ACHD's leading crops are alfalfa hay, alfalfa seed, grain sorghum, cotton, corn and wheat. The crops and livestock that are raised annually in the AHCD generate over $40 million in revenue. The listing of the Lesser Prairie-Chicken will impact the AHCD and the agricultural operators that depend on it.

27.     Plaintiff Quay County F&LB is the county affiliate of the New Mexico Farm and Livestock Bureau. Quay County F&LB is a grass roots, nonprofit organization representing farmers, ranchers, landowners and related businesses in Quay County. The organization is funded through membership dues and is led by a board of locally elected officers. The

organization actively works to protect property rights, Quay County farmers' and ranchers' livelihoods, and the local community. Quay County F&LB also donates funds to 4H and FFA youth activities, community projects and scholarships to deserving high school graduates who are continuing their education in agricultural related fields of study. The listing of the Lesser Prairie-Chicken directly impacts agricultural and ranching operations of the Quay County F&LB membership.

28.     Plaintiff Curry County is located in eastern New Mexico with a 2010 census population of 48,376. Curry County is located 220 miles from Albuquerque, New Mexico, 100 miles from Lubbock, Texas, and is the home of the Cannon Air Force Base 27th Special Operations Wing, AFSOC. In 2013, Cannon Air Force Base had a total payroll of $314.4 million. Curry County is also home to Southwest Cheese, the largest cheddar cheese production facility in North America, and BNSF Railroad. Curry County has a strong agriculture community with cattle, ranching, dry land production, farming and dairies. In 2012, there were approximately 600 farms consisting of 880,822 acres with an average farm size of 1,468 acres. There are 27 dairies in Curry County which generate about $27 million each month. Curry County is the future home of the Tres Amigas project that will unite the nation's electricity grid with the work performed in Curry County. Tres Amigas is focused on providing the first interconnection of the country's three power grids – the western interconnection, eastern interconnection and the transmission system controlled by the Electrical Reliability Council of Texas, Inc.  The three grids are not currently interconnected, which precludes the nation from sharing generation resources or energy across the three grids. Curry County also has a wind farm in northern Curry County – Broadview Energy Prime – with other developers looking at the area. The potential renewable energy development opportunities, agriculture and the Cannon Air

Force Base are vitally important to the economic development in Curry County and are directly impacted by the listing of the Lesser Prairie-Chicken as a threatened species.

29.     Plaintiff Quay County is located in northeastern New Mexico with a 2010 census population of 9,041. Quay County is a major transportation hub with the Union Pacific Railroad, Interstate 40, and U.S. 54 all transecting its jurisdiction. Quay County is noted for its agricultural industry with cattle ranching, dry-land farming, and the Arch Hurly Conservancy District providing irrigation form the Conchas Dam to farmers in the Tucumcari Project. Wheat and cattle are the primary agricultural products with sales of over $35 million in 2007 (approximately 25 per cent attributed to growing crops and 74 percent from livestock). Ute Reservoir and State Park near Logan, New Mexico, and the Conchas lake provide water for recreation and fishing in Quay County. There are two wind farms currently operating in the county, one south of San Jon and the other west of House. Mesalands Community College in Tucumcari has a wind turbine located on campus property, benefitting the North American Wind Research and Training Center ("NAWRTC"). Wind potential in the region combined with the newly developed NAWRTC facility and program represent critical economic developments and future opportunities for Quay County.

30.     Defendant DEPARTMENT OF THE INTERIOR ("Interior") is the federal agency charged with the administration of much of the ESA, including the listing procedures contained in 16 U.S.C. § 1533.

31.     Defendant FISH & WILDLIFE SERVICE is a part of Interior that is delegated the responsibility to implement much of the ESA, including determining the species for which listing under the ESA should be decided and which of these species should be classified as candidate species pursuant to 16 U.S.C. § 1533(b)(3)(B)(iii), (C)(i).

32.     Defendant SALLY JEWELL is the Secretary of Interior, and is sued in her official capacity.   Secretary Jewell, in her capacity as Secretary of Interior, has ultimate responsibility for Interior and FWS's actions under the ESA.

33.     Defendant DANIEL M. ASHE is the Director of FWS and is sued in his official capacity.   Director Ashe oversees FWS, the agency charged with implementing much of the ESA.

34.     Defendant GARY FRAZER is the Assistant Director for Endangered Species at FWS, and is sued in his official capacity.   Assistant Director Frazer oversees the listing function of FWS under the ESA.

35.     Defendant DIXIE PORTER is the Field Supervisor for the Oklahoma Ecological Services Field Office of FWS and is sued in her official capacity.   Ms. Porter has participated in FWS's regulatory efforts for the Lesser Prairie-Chicken and other species.   She supervises FWS's implementation of the ESA within the State of Oklahoma. ("FWS" refers to the Defendants collectively unless otherwise specified).

## LEGAL FRAMEWORK

### THE ENDANGERED SPECIES ACT

36.     Originally enacted by Congress in 1973, the ESA provides protections to the benefit of those species of fish, wildlife and plants that face declining populations and, potentially, extinction. 16 U.S.C. § 1531(b).

37.     Section 4 of the ESA enumerates five factors to be reviewed by the Service for determinations of whether a species is "threatened" or "endangered." 16 U.S.C. § 1533(a)(1); *see also* 50 C.F.R. §§ 424.10, 424.11(c).

38.     The statute also contains various mandates for the protection of listed species. *See e.g.*, 16 U.S.C. 1532(19), 1533(f), 1536(b)(3)(A), 1538. For example, once a species is listed as

threatened or endangered, the ESA imposes an express prohibition on "taking" the species, where taking means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in such conduct."  16 U.S.C. § 1532(19).  Under FWS regulations, "harm" can "include significant habitat modification or degradation" where "essential behavioral patterns, including breeding, feeding, or sheltering" are significantly impaired. 40 C.P.R. § 17.3.

39.     Thus, ranching and operations can allegedly "take" a listed species if the operations merely modify or degrade the habitat of listed species or inadvertently harass a single member of the species. The cost to the ranching and farming industries of avoiding a "take" of a listed species can be enormous and, in some instances, can preclude operations in their entirety.

LISTING PROCEDURES

40.     Any "interested person" may petition the Service to list a species as threatened or endangered. *See* 16 U.S.C. § 1533(b)(3). "To the maximum extent practicable," FWS must then determine within 90 days whether the petition presents "substantial scientific or commercial information indicating that the petitioned action may be warranted." 16 U.S.C. § 1533(b)(3)(A). If the 90-day finding concludes that the petition does not present substantial information indicating that listing may be warranted, the listing process is terminated for that petition. If the Service makes a positive 90-day finding for a species, it must determine, within 12 months, whether the petitioned action is (i) "not warranted," (ii) "warranted," in which case a listing rule is proposed, or (iii) "warranted but precluded" by other priorities. *Id.* § 1533(b)(3)(B).

41.     When making determinations, the statute demands that the Service "shall" make its listing determinations,

solely on the basis of the best scientific and commercial data available . . . after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State . . . or any political subdivision of a State . . . to protect such species whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction.

16 U.S.C. § 1533(b)(1)(A).

42.     If the Service's 12-month finding concludes that listing is "warranted" the ESA provides the Service with two options: (i) issue a proposed listing rule, *id.* at 1533(b)(3)(B)(ii); or (ii) determine, based upon science-driven prioritization, that the listing is "warranted but precluded."  16 U.S.C. §§ 1533(b)(3)(C)(iii),  l533(h)(3).

43.     A species that receives "warranted but precluded" status is considered a "candidate species" and, annually, the Service must re-evaluate each candidate species, following the statutory criteria for a 12-month finding:

A petition with respect to which a [warranted but precluded] finding is made . . . *shall* be treated as a petition that is resubmitted . . . under subparagraph (A) on the date of such finding and that presents substantial scientific or commercial information that the petitioned action may be warranted.

16 U.S.C. § 1533(b)(3)(C)(i). With each annual review of a candidate species, FWS must fully repeat the same statutory process, which includes the statutory mandate directing the service to consider all three alternatives anew.

44.     Therefore, FWS must fully consider whether:

The petitioned action is warranted, but that –

(I)     the immediate proposal and timely promulgation of a final regulation implementing the petitioned action . . .  *is precluded by pending proposals to determine whether any species is an endangered species or a threatened species*; and

(II)    expeditious progress is being made to add qualified species to either of the [ESA] lists . . . and to remove from such lists species for which the protections of this chapter are no longer necessary.

16 U.S.C. § 1533(b)(3)(B)(iii) (emphasis added). FWS is required to consider whether it has sufficient resources to meet its obligations for pending candidate species. Once it knows the agency does not have sufficient resources to propose rules on listing and critical habitat for all candidate species, FWS is required to make a reasoned decision as to which of the candidate species should be brought forward to make a listing decision.

45.    There is no deadline for proposing a rule to list candidate species nor any limit to the time a species can remain in "candidate" status. In each annual review after a species is designated as a candidate species, the Service, guided by its evaluation of the five factors specified in the statute and using the "best" data "available," retains the statutory prerogative of determining the species' listing is warranted but precluded by other priorities, and, consequently, the species should remain a candidate species for the following year. *See* 16 U.S.C. §§ 1533(b)(3)(C)(i), (b)(1). The Service must also consider efforts to protect the species by the states and political subdivisions thereof. *See* 16 U.S.C. § 1533(b)(1). FWS cannot eliminate, in its annual reconsideration of a candidate species, the alternative of retaining that species within the candidate species classification.

46.    The Service has promulgated regulations implementing the ESA listing alternatives. Not surprisingly, FWS's regulations construe the statutory directive for annual review of candidate species as requiring FWS to consider retaining the species within the candidate species category:

(3)  Upon making a positive finding under paragraph (b)(1) of this section, the Secretary shall commence a review of the status of the species concerned and shall make, within 12 months of receipt of such petition, one of the following findings:

(i)    The petitioned action is not warranted, [ ],

(ii)   The petitioned action is warranted, [ ] or

(iii)   The petitioned action is warranted, but that –

    (A)   The immediate proposal and timely promulgation of a regulation to implement the petitioned action is precluded because of other pending proposals to list, delist, or reclassify species, and

    (B)   Expeditious progress is being made to list, delist, or reclassify qualified species, in which case, such finding shall be promptly published in the Federal Register together with a description and evaluation of the reasons and data on which the finding is based.

(4)  If a finding is made under paragraph (b)(3)(iii) of this section with regard to any petition, the Secretary shall, within 12 months of such finding, again make one of the findings described in paragraph (b)(3) with regard to such petition, but no further finding of substantial information will be required.

50 C.F.R. § 424.14(b).

47.     Thus, the statute and regulation mandate that FWS choose among *all three alternatives each year,* based upon the information available at that time.  The language of the statute and regulation does not permit FWS to make a decision based upon speculation as to the future status of a candidate species.  Nor may FWS rely on old information that has not been updated in the current year. Rather, FWS must reevaluate the candidate species annually and decide, based upon then available data and conservation practices, *inter alia,* whether the species should remain as a candidate species.

48.     Throughout the 30-year history of this statutory provision and its regulatory counterpart, FWS has followed a practice of reconsidering each candidate species on an annual basis, while retaining the statutory prerogative of keeping each species as a "candidate species" based upon its respective priority for listing.

CANDIDATE SPECIES

49.     FWS has described a "candidate species" as a species "for which we have on file sufficient information on biological vulnerability and threats to support a proposal to list as endangered or threatened but for which preparation and publication of a proposal is precluded by higher priority listing actions."  78 Fed. Reg. 70,104 (Nov. 22, 2013).  If a species is determined to be "warranted" for listing but is "precluded by pending proposals" for listing other species under Section 4(b)(3)(C)(iii),  the species becomes a "candidate species."  *See* 16 U.S.C. § 1533(b)(3)(C)(iii).

50.     One reason FWS classifies species as candidate species is "to provide information that may stimulate and guide conservation efforts that will remove or reduce threats to these species and possibly make listing unnecessary." 78 Fed. Reg. at 70,104. According to FWS, its policy is to *"strongly encourage collaborative conservation efforts for candidate species,* and offer technical and financial assistance to facilitate such efforts." *Id.* at 70,105 (emphasis added).

51.     The candidate species classification benefits states, local governments, individual landowners and candidate species because it promotes the implementation of voluntary conservation programs that not only avoid "restrictive land use policies" associated with listed species but also facilitates "greater management flexibility to stabilize or restore [candidate] species and their habitats . . . ."[4] The Service acknowledges the same when recognizing that, "[i]deally, sufficient threats can be removed to eliminate the need for listing." *Id.* Thus, as time passes and priority listing decisions are processed and implemented, species that remain

---

[4]     U.S. FISH & WILDLIFE SERVICE, CANDIDATE SPECIES (2011), http://www.fws.gov/endangered/esa-library/pdf/candidate_species.pdf (last visited August 22, 2014).

classified as candidate species are allowed the opportunity to properly recover and, thereby, justify a finding by FWS that the species are "not warranted" for listing as threatened or endangered.

52.     FWS must act on candidate species in accordance with the priority system mandated by Congress. In 1979, Congress amended the ESA by adding a new Section 4(h), requiring FWS to adopt "agency guidelines to insure that the purposes of this section are achieved efficiently and effectively," including "a ranking system to assist in the identification of species that should receive priority review for listing." *See* Pub. L. No. 96-159, 93 Stat. 1225, 1226 (1979). In 1982, Congress again addressed the mandate, amending Section 4(b)(3)(B) to its current form to require FWS to make one of three substantive determinations for a species: (i) the listing is "not warranted," (ii) listing the species is "warranted" in which case a listing rule will be proposed, or (iii) the listing is warranted but precluded by higher priority pending proposals. *See* 16 U.S.C. § 1533(b)(3)(B).

53.     When the 1982 amendment was debated and passed, Congress recognized the Service's limited resources were insufficient to respond to the increasing volume of petitions filed by special-interest advocacy organizations demanding listing decisions for various species on the statutory schedule demanded by the ESA. Congress accordingly determined that: "the listing agencies should utilize a *scientifically based priority system* to list and delist species, subspecies and populations based on the degree of threat, and proceed in an efficient and timely manner." H.R. Rep. No 97-835 (1982) (Conf. Rep.), *reprinted in* 1982 U.S.C.C.A.N. 2860, 2862 (emphasis added).

54.     The statute directs FWS to adopt a "ranking system to assist in the identification of species that should receive priority review under [ESA §4(a)(l)]." 16

U.S.C. § 1533(h)(3). Under the policy adopted in 1983 to implement this requirement, FWS assigns a priority for action to each species on the candidate list.  As the Service noted when it adopted this now 30- year-old policy, "it is necessary to assign priorities to listing, delisting, reclassification, and recovery actions in order to make the most appropriate use of the limited resources available to implement the [ESA]." 48 Fed. Reg. 43,098 (Sept. 21, 1983).  FWS has explained that, in order to assign priorities among candidate species, FWS considers, first, the magnitude of the threats to each candidate species; second, the immediacy of the threat; and third, the taxonomic status of the species.  *See* 78 Fed. Reg. 70,104, 70,105 (Nov. 22, 2013).  This detailed analysis generates a listing priority number ("LPN") ranging from 1 (highest) to 12 (lowest).  The "LPN ranking system provides a basis for making decisions about the relative priority for preparing a proposed rule to list a given species." *Id*.

55.     Since implementing the science-based priority system in 1983, the number of species that became the subject of listing petitions, 90-day findings, and 12-month findings has increased dramatically. By 2010, 251 species were on the candidate species list. *See* 75 Fed. Reg. 69,222 (Nov. 10, 2010). In addition to the species covered by the settlements described hereafter, one of the settling advocacy organizations petitioned for the listing of more than 400 additional species, 78 Fed. Reg. 49,436 (Aug. 14, 2013), and, after entering into these settlements, the same organization petitioned for the listing of an additional 53 species.[5]

---

[5]     PETITION TO LIST 53 AMPHIBIANS AND REPTILES IN THE UNITED STATES AS THREATENED OR ENDANGERED SPECIES UNDER THE ENDANGERED SPECIES ACT (July 11, 2012), http://www.biologicaldiversity.org/campaigns/amphibian_conservation/pdfs/Mega_herp_petition_7-9-2012.pdf (last visited August 22, 2014).

## PROCEDURAL AND FACTUAL BACKGROUND

**SETTLEMENT AGREEMENTS FOR CANDIDATE SPECIES**

56.     In 2010, a multi-district litigation panel consolidated in the U.S. District Court for the District of Columbia twelve actions against FWS seeking various listing decisions from the Service for a variety of species.[6] Two special-interest litigants – WildEarth Guardians and the Center for Biological Diversity – brought the actions that addressed a portion of the candidate species.

57.     Though FWS had initially questioned the plaintiffs' standing and the justiciability of some of the actions, FWS discarded its defenses and entered into settlements that exceeded the demands of the lawsuits before the court.  In May 2011, FWS concluded its first settlement with WildEarth Guardians.[7] The WildEarth Guardians Settlement was not confined to the candidate species at issue in the original WildEarth Guardians complaints.[8] Rather, FWS agreed to a settlement that swept in *all* of the 251 species within the candidate species classification catalogued in FWS's then most current publication on the subject, the November 10, 2010 Candidate Notice of Review ("CNOR"), 75 Fed. Reg. 69,222 (Nov. 10, 2010).

58.     In the WildEarth Guardians Settlement, FWS agreed to submit either a "warranted" decision along with a proposed listing rule *or* a "not warranted" decision for each of the 251 candidate species on a schedule ending in Fiscal Year 2016. The

---

[6]     *See In re* Endangered Species Act Section 4 Deadline Litigation, 716 F.Supp.2d 1369 (MDL 2010).

[7]     *See* Stipulated Settlement Agreement, *In re* Endangered Species Act Section 4 Deadline Litigation, Misc. Action No. 10-377 (EGS) (D.D.C. May 10, 2011) (the "WildEarth Guardians Settlement").

[8]     In addition to the candidate species at issue in the litigation, WildEarth Guardians also had cases that addressed nine Texas mollusks, the Utah population of the gila monster, and the Mexican wolf consolidated for purposes of resolving 90-day and 12-month findings.

WildEarth Guardians Settlement specifies interim numbers of species that must either be proposed or determined to be listed: 130 out of 251 by September 30, 2013, no fewer than 160 out of 251 by September 30, 2015.[9] Additionally, the WildEarth Guardians Settlement required that FWS make a series of determinations and propose listings as specified in years 2011 and 2012.[10]

59.     Under the WildEarth Guardians Settlement, FWS committed to removing the Lesser Prairie-Chicken from the candidate species category no later than Fiscal Year 2012.[11] FWS listed the Lesser Prairie-Chicken in April of this year. 79 Fed. Reg. 19,974 (Apr. 10, 2014).

60.     FWS also committed that, for each of the 251 candidate species, the Service would *not* consider the alternative otherwise available to the ESA: to retain the candidate species classification beyond the WildEarth Guardians Settlement-imposed deadline for a listing decision. This commitment is enforceable regardless of any scientific data, any change in priority for a species, or the cumulative effect of conservation measures that might provide sufficient justification for FWS to retain the candidate classification for such species.

61.     On July 12, 2011, the Service entered into a settlement with the other special-interest plaintiff, Center for Biological Diversity (the "CBD Settlement").[12] In this settlement, FWS similarly committed itself to submit a proposed listing rule or a "not warranted" finding for 39 additional species within specified fiscal years for a period extending from 2011 to

---

[9]     WildEarth Guardians Settlement at 6.
[10]    *Id.* at 1, Exh. B.
[11]    *Id.* Exh. B. at 4.
[12]    *See* Stipulated Settlement Agreement, *In re* Endangered Species Act Section 4 Deadline Litigation, Misc. Action No. 10-377 (EGS) (D.D.C. July 12, 2011) (the "CBD Settlement").

2017. Most of these 39 species were the subject of the previous WildEarth Guardian Settlement, and the CBD Settlement specified precise deadlines for FWS's circumscribed determinations. The remaining species in the CBD Settlement were not, at that time, within the candidate species category but nonetheless became, under this settlement, subject to deadlines for FWS to decide between issuing a listing rule or making a "not warranted" decision; consistent with the WildEarth Guardian Settlement, the CBD Settlement did away with consideration of the "warranted but precluded" alternative required by ESA and FWS regulations. (Collectively, the WildEarth Guardians Settlement and the CBD Settlement are referred to as the "Settlements.").

62. In the CBD Settlement, FWS committed that, for each of these additional 39 species, the Service would *not* consider the alternative available under the ESA to retain the candidate species classification regardless of then-available scientific data, any change in priority for a species, or conservation measures that might otherwise be the basis to retain the candidate species classification under the ESA.

63. At the time FWS entered into the Settlements, the agency knew or should have known it would not have the resources to make listing decisions in accordance with its statutory duty to use the best scientific and commercial data available for all of the hundreds of species subject to the Settlements. Indeed, FWS has never made so large a number of listing decisions in so short a time. FWS should have recognized at the time that the number of species slated for such decisions would overwhelm the resources available for listing.

64. FWS therefore knew or should have known that, for many of the hundreds of species for which it obligated itself to make decisions, the "proposal and timely promulgation of a final regulation implementing the petitioned [listing] action" would be "precluded by

pending proposals." 16 U.S.C. § l533(b)(3)(B)(iii)(l). FWS knew or should have known that, to follow the dictates of the statute, the agency is *required* to prioritize candidate species and to retain some of these species within the candidate classification.

65.     In its listing program, FWS places its highest priority on "[c]ompliance with court orders and court-approved settlement agreements requiring that petition findings or listing or critical habitat determinations be completed by a specific date." 78 Fed. Reg. 49,422, 49,436 (Aug. 14, 2013).  Consequently, FWS will comply with the Settlements' arbitrary deadlines even if newly available scientific or commercial data demonstrate that, due to its relatively low priority, a species should properly remain within the candidate species classification for a time period exceeding the deadlines imposed by the Settlements.

66.     Not only did FWS decline to defend the litigation giving rise to these Settlements, but when two other parties attempted to intervene, FWS mounted vigorous objection, maintaining that the parties did not have cognizable interests in the litigation and the court should deny intervention. The court adopted the government position, rejecting, on procedural grounds, any participation by entities that had not been a party to the litigation.[13]

67.     Despite its claim that the Settlements would reduce the volume of listing deadline litigation, FWS continues to receive many new petitions. Shortly before the Settlements were reached, FWS received a single petition from CBD to list 404 species. 78 Fed. Reg. 49,436 (Aug.

---

[13]     *See In re* Endangered Species Action Section 4 Deadline Litigation, 270 F.R.D. 1 (D.D.C. 2010) (rejecting proposed intervention from Tejon Ranch Company concerning the Tehachapi Slender Salamander); *In re* Endangered Species Action Section 4 Deadline Litigation, 277 F.R.D. 1 (D.D.C. 2011) (rejecting intervention regarding Lesser Prairie-Chicken, New England Cottontail, and Greater Sage Grouse); *see also In re* Endangered Species Action Section 4 Deadline Litigation, 704 F.3d 972 (D.C. Cir. 2013) (affirming rejection of intervention); *Cf* Nat'l Ass'n of Homebuilders v. FWS, No. 12-2013 (D.D.C. Mar. 31, 2014) (dismissing a separate group of plaintiffs' challenge to the Settlements for lack of standing, citing the Tejon Ranch Company decisions, among others).

14, 2013). After the Settlement was reached, CBD filed another petition for an additional 53 species.[14] And CBD is just one of many special interest groups that routinely file petitions. The Service has acknowledged the new petitions will "significantly increase[e]" the number of listing and critical habitat actions "with absolute statutory deadlines." *Id.* FWS distinctly does not have the resources to engage in a listing evaluation for all of the species subject to the Settlements, and many of them clearly should be retained as candidate species. Nevertheless, even if, as measured by FWS's longstanding guidance for prioritizing species, some of the candidate species at issue in this litigation would have a relatively low priority, FWS will make a listing decision on species subject to the Settlements *before* it will consider other, higher priority species.

68.     In sum, the Settlements require, for 290 candidate species, most of which were not even initially the subject of the consolidated litigation, that FWS (i) eliminate continuation of the ESA-authorized candidate species classification regardless of the applicable science, conservation measures, or priority; (ii) decide, for each of these species, either that listing is "not warranted," or that listing is "warranted" and a listing rule must be proposed; and (iii) abide by a lockstep schedule to make these listing decisions through late 2017. FWS denied the public an opportunity to participate in this regulatory decision; FWS never proposed a change to existing regulations that require FWS to consider retaining the candidate species classification. Instead, FWS was quick to oppose any participation by affected entities in the litigation that spawned the Settlements. Therefore, the Plaintiffs have never had an opportunity to participate in the decision that gave rise to FWS's disregard of

---

[14]     PETITION TO LIST 53 AMPHIBIANS AND REPTILES IN THE UNITED STATES AS THREATENED OR ENDANGERED SPECIES UNDER THE ENDANGERED SPECIES ACT (July 11, 2012), http://www.biologicaldiversity.org/campaigns/amphibian_conservation/pdfs/Mega_herp_petition 7-9-2012.pdf (last visited August 22, 2014).

its statutorily-imposed obligations and radical departure from its decades old policy for candidate species.

**THE LESSER PRAIRIE CHICKEN**

69.    On April 10, 2014, FWS listed the Lesser Prairie-Chicken as "threatened."

70.    On June 9, 1998, the Service determined that listing of the Lesser Prairie-Chicken under the ESA was "warranted but precluded" by other higher priority actions and classified the Lesser Prairie-Chicken as a candidate species.  63 Fed. Reg. 31,400 (June 9, 1998).

71.    In December 2008, the priority of the Lesser Prairie-Chicken was updated so that, under the FWS 12-point scale, the Lesser Prairie-Chicken had a higher priority ranking. 73 Fed. Reg. 7517 (Dec. 10, 2008). According to FWS, this change was due to a "change in the magnitude of the threat from development of wind energy and associated placement of transmission lines throughout the estimated occupied range of Lesser Prairie-Chicken." *See* 77 Fed. Reg. 73,827, 73,830 (Dec. 11, 2012).

72.    The Bureau of Land Management has entered into a Candidate Conservation Agreement with FWS designed to conserve the Lesser Prairie-Chicken.  In addition, FWS entered into "umbrella" CCAAs for the Lesser Prairie-Chicken in New Mexico, Texas, and Oklahoma.  Under these agreements, the participants implement certain conservation measures that are anticipated to reduce threats to the Lesser Prairie-Chicken and improve population stability.  On March 1, 2012, the New Mexico State Land Office enrolled all conserved Lesser Prairie-Chicken habitat on State Trust lands into these agreements.  Other actions taken by New Mexico, private interests, and the Bureau of Land Management have conferred conservation benefits on Lesser Prairie-Chicken habitat in New Mexico. ODWC's Agricultural CCAA for

the Lesser Prairie-Chicken covers agricultural activities, including activities carried out by Plaintiff member ranches and farms, on non-federal lands in several Oklahoma and New Mexico counties.

73.     WildEarth Guardians brought suit against FWS seeking a listing of the Lesser Prairie-Chicken in 2010 in the U.S. District Court for the District of Colorado.  The Lesser Prairie-Chicken was addressed in the District Court for the District of Columbia.[15]  The WildEarth Guardians Settlement dictates a listing deadline by FY 2012; FWS is not allowed, under this settlement, to consider retaining the Lesser Prairie-Chicken as a candidate species notwithstanding recent, robust conservation efforts and data that might otherwise support FWS's assigning the Lesser Prairie-Chicken a high LPN (i.e., a lower priority for conservation in comparison to other candidate species).

74.     Pursuant to the WildEarth Guardians Settlement, in December 2012, the Service proposed to list the Lesser Prairie-Chicken as threatened throughout its range. 77 Fed. Reg. 73,828 (Dec. 11, 2012).   The Service did not consider the potential to continue the classification of the Lesser Prairie-Chicken as a candidate species.  Nor did the Service re-evaluate the priority of the Lesser Prairie-Chicken, based upon current science and conservation measures, to discern whether the Lesser Prairie-Chicken's priority might have declined as against other candidate species.

75.     Had FWS inquired, it would have discovered a number of relevant developments that might well have led the Service to conclude that the Lesser Prairie-Chicken's status had changed and that this species' priority, vis-a-vis other species, was now so low that the Lesser Prairie-Chicken should have remained a candidate species. Among the

---

[15]     *See In re* Endangered Species Act Section 4 Deadline Litigation, No. 10-377 (EGS), MDL Docket NO. 2165 (D.D.C.)

subjects that FWS should have considered is assessing whether the Lesser Prairie-Chicken should remain as a candidate species are:

    a.    evidence that the range of Lesser Prairie-Chicken is expanding;

    b.    evidence that the population of the Lesser Prairie-Chicken is stabilizing and increasing;

    c.    the Range Wide Plan, the O&G CCAA, the Agricultural CCAA covering several states;

    d.    practices adopted by the Oklahoma Wildlife Conservation Commission in a Memorandum of Agreement with the Oklahoma Independent Petroleum Association under the State of Oklahoma's CCAA;

    e.    the Candidate Conservation Agreement with the Bureau of Land Management;

    f.    ODWC's Agricultural CCAA;

    g.    the umbrella CCAAs for private lands in New Mexico, Oklahoma, and Texas; and

    h.    the status of wind projects and power line construction and also recent conservation efforts made by the wind industry.

76.    In its proposed listing rule for the Lesser Prairie-Chicken, FWS summarized 43 existing conservation measures but unlawfully declined to consider these in connection with its decision to remove the Lesser Prairie-Chicken from the candidate species classification.

77.    On May 6, 2013, the Service proposed a special rule, 78 Fed. Reg. 26,302 (May 6, 2013), under section 4(d) of the ESA, 16 U.S.C. § 1533(d), that would allow for take of the Lesser Prairie-Chicken incidental to activities conducted pursuant to a Service-approved comprehensive conservation program developed by or in coordination with a state agency. The rule also proposed authorizing take incidental to agricultural activities included in a conservation plan developed by the Natural Resources Conservation Service ("NRCS") for private agricultural lands in connection with the NRCS's Lesser Prairie-Chicken Initiative. More

recently, on December 11, 2013, the Service published a revised proposed 4(d) special rule and reopened public comment for the Section 4(d) special rule and listing proposal.

78.     On April 10, 2014, the Service listed the Lesser Prairie-Chicken as a threatened species. In response to public comments asking why the Service did not consider retaining the designation for the Lesser Prairie-Chicken as "warranted but precluded," the Service offered no explanation other than that some six years earlier it had changed the species' LPN from 8 to 2, in 2008. 79 Fed. Reg. 19,974, 19,986 (Apr. 10, 2014). But even after changing the LPN in 2008, the Service repeatedly determined, in 2009, 2010 and again in 2011, that the Lesser Prairie-Chicken was "warranted but precluded." The listing decision is silent as to anything that might have changed since the 2009-2011 determinations, whether that be new scientific information that indicates increased threats to the viability of the species relative to other species, a change in the Service's resources to address listing decisions, or the sudden absence of other candidate species with an equal or higher priority.

79.     Following FWS policies designed to conserve candidate species and thereby retain flexibility that is unavailable for a listed species, several states facilitated development of the FWS-endorsed Range-Wide Plan.

80.     On January 25, 2013, FWS approved the Agricultural CCAA.   The Farm Bureau worked closely with the ODWC to draft the Agricultural CCAA, and many farms and ranches are enrolled under it.

81.     Under FWS's published policy, to approve a CCAA, FWS "must determine" that the CCAA, if implemented on necessary properties, "would preclude or remove any need to list the covered species." 64 Fed. Reg. 32,726, 32,734 (June 17, 1999). Even though FWS, by the terms of its own policy, must have found that the CCAAs could remove the need for listing

the Lesser Prairie-Chicken, the agency, having foregone its ability to retain the Lesser Prairie-Chicken in the candidate species category, chose to list the Lesser Prairie-Chicken as threatened.

## CLAIMS FOR RELIEF

### Count I
### Violations of the APA:
### Elimination of the ESA's "Warranted but Precluded" Alternative

82.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 82 of the Complaint, as though fully set forth below.

83.    The ESA requires that, upon receiving a petition for listing a species as threatened or endangered, the Secretary must make a preliminary finding as to whether that petition "presents substantial scientific or commercial information indicating that the petitioned action *may* be warranted."    16 U.S.C. § 1533(b)(3)(A) (ESA § 4) (emphasis added); 50 C.F.R. § 424.14(b).

84.    If the Secretary concludes that listing *may* be warranted, the Secretary must review the status of the species and, within 12 months, make one of the following *three* findings:

      a.      The petitioned action is not warranted;

      b.      The petitioned action is warranted and listing is proposed; or

      c.      The petitioned action is warranted, but the immediate proposal and timely promulgation of a final regulation implementing the petitioned action is precluded by pending proposals.

*See* 16 U.S.C. § 1533(b)(3)(B); *see also* 50 C.F.R. § 424.14(b).

85.    Where FWS determines that listing for a species is "warranted but precluded," the Service must revisit that decision annually. *Id.*

86.    Neither the statute nor FWS's regulations limit the time that a particular species can remain as a "candidate species," and FWS itself has formally taken the position that there is no time limit on its ability to declare annually that a species should remain a "candidate species."

87.     By entering into the Settlements, FWS has agreed, without the benefit of either statutory amendment or administrative rulemaking procedures, to eliminate one of the statutorily mandated alternatives for categorizing species that are the subject of a listing petition:  FWS has agreed to eliminate the possibility of retaining the "candidate species" classification for these species.

88.     FWS, in evaluating the potential listing of the Lesser Prairie-Chicken, chose between two options:  proposing to list the species or eliminating it from listing consideration altogether.

89.     FWS's agreement to eliminate one of the statutorily mandated alternative findings violates the ESA as well as FWS's own regulations, and, therefore, is not in accordance with law and must be set aside under 5 U.S.C. § 706(2) and 16 U.S.C. § 1540(g).

## Count II
## Violation of the APA: Rulemaking Without the Requisite Legal Process

90.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 89 of this Complaint, as though fully set forth below:

91.     Under 16 U.S.C. § 1533(b)(4), FWS's promulgation or amendment of rules implementing the ESA must comply with the rulemaking provisions of the Administrative Procedure Act, set forth in 5 U.S.C. § 553.

92.     Under the APA and ESA, FWS can adopt or amend its rules only if it (a) publishes notice of the proposed action in the Federal Register, (b) gives all interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments, (c) considers all such comments before adopting the rule or amendment, and (d) incorporates in the rule a concise general statement of its basis and purpose. *See* 5 U.S.C. §

553(c); 16 U.S.C. § 1533(a)(4) (APA section 553 applicable to regulations implementing the ESA).

93.     "Rulemaking" as defined in 5 U.S.C. § 551(5) "means agency process for formulating, amending, or repealing a rule."  FWS's commitment in the Settlements to truncate its decision-making process constitutes rulemaking because it nullifies key parts of FWS's regulations for listing decisions as applied to almost 300 species, including *all* of the species then classified as "candidate" species.

94.     Where FWS makes a preliminary finding that listing may be warranted, the regulations require it to further review the species' status and make one of three findings:

(i)     The petitioned action is not warranted or

(ii)    the petitioned action is warranted, in which case the Secretary shall promptly publish in the Federal Register a proposed regulation to list the species or

(iii)   The petitioned action is warranted but that —

(A)     The immediate proposal and timely promulgation of a regulation to implement the petitioned action is precluded because of other pending proposals to list, delist, or reclassify species; and

(B)     Expeditious progress is being made to list, delist, or reclassify [other] qualified species.

50 C.F.R. § 424.14(b).

95.     FWS's agreement to the Settlements unlawfully amends its regulations by imposing mandatory deadlines for removing *all* of the 2010 candidate species from the candidate species classification.   Essentially, FWS has, through its Settlements, amended its regulations to eliminate the candidate species classification, without regard for science, conservation measures, or any other criteria that might support keeping the species within the candidate species classification.

96.     The Settlements required that FWS either propose the candidate species, including the Lesser Prairie-Chicken, or remove them from consideration with a "not warranted" finding by specified deadlines. FWS thereby bound itself *not* to retain these species in the candidate species classification. The Settlements do not allow FWS to consider classifying these species as "warranted but precluded" by higher-priority decisions for other species beyond the specified deadlines.  Eliminating one of the regulatory options for all of the candidate species is an unlawful attempt to impart substantive changes to the regulations without the requisite rulemaking procedures or, at the very least, a clear violation of these regulations.

97.     The Court should set aside FWS's decision not to consider continued retention of the candidate species, including the Lesser Prairie-Chicken, as candidate species beyond the deadlines in the Settlements as contrary to section 706 of the APA because that decision constitutes rulemaking "without observance of procedure required by law" under 5 U.S.C. § 553 and 16 U.S.C. § 1533(a)(4). FWS effectively amended its regulations without publishing notice in the Federal Register, without giving the public an opportunity to comment, and without providing a statement of basis and purpose.  Alternatively, FWS's commitment in the Settlements to ignore its regulations as applied to the candidate species, including the Lesser Prairie-Chicken, is blatantly "not in accordance with law," and for that further reason this Court should set aside these commitments under the APA.

**Count III**
**Violation of the APA and ESA For FWS's Lesser Prairie-Chicken Listing Decision**

98.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 97 of this Complaint, as though fully set forth below.

99.     By listing the Lesser Prairie-Chicken as a "threatened" species under the ESA, FWS violated the APA and the ESA. FWS's listing decision is arbitrary, capricious, and contrary to law. *See* 5 U.S.C. § 706.

100.     FWS decided to proceed with a listing rule and neglected even to consider retaining the species as "warranted but precluded" by higher priorities. *See* 16 U.S.C. §§ 1533(b)(3)(B). Instead, FWS chose between just two of the three statutory options: proposing to list the species or eliminating it from listing consideration. FWS thereby violated the ESA.

101.     Accordingly, FWS's decision to list the Lesser Prairie-Chicken as a "threatened" species is contrary to law and must be set aside. *See* 5 U.S.C. § 706.

## PRAYER FOR RELIEF

Plaintiffs Brad and Andrea Hutchison, NMCGA, NMWG, NMFLC, Southwest Quay SWCD, AHCD, Quay County F&LB, Curry County, and Quay County respectfully request that this Court enter judgment in their favor, and

1.     Declare that FWS violated the ESA, its implementing regulations, and the APA by eliminating, from among the alternatives prescribed by 16 U.S.C. § 1533(b)(3)(B), the ability to retain the candidate species classification for the Lesser Prairie-Chicken;

2.     Declare that FWS's action in violation of the ESA, and its implementing regulations and guidelines thereunder, must be set aside and vacated as "not in accordance with law," under Section 706 of the APA;

3.     Declare that FWS's elimination of the candidate species alternative is an unlawful rulemaking without required legal process in violation of the APA and ESA;

4.     Vacate and remand to FWS the FWS decision to list the Lesser Prairie-Chicken as threatened under the ESA;

5.      Enjoin any future decision to list the Lesser Prairie-Chicken that excludes from consideration the potential for determining that the species should remain a candidate species;

6.      Award costs of litigation (including reasonable attorneys' fees) to Plaintiffs; and

7.      Grant Plaintiffs such other relief as may be necessary and appropriate or as the Court deems just and proper.

RESPECTFULLY SUBMITTED this 27th day of August, 2014.


*s/Karen Budd-Falen*
Karen Budd-Falen
BUDD-FALEN LAW OFFICES, LLC
300 East 18th Street
P.O. Box 346
Cheyenne, Wyoming 82003-0346
(307) 632-5105 Telephone
(307) 637-3891 Facsimile
karen@buddfalen.com
(*Pro Hac Vice* motions to be submitted)


*s/Gerald L. Hilsher*
Gerald L. Hilsher, OBA #4218
Robert J. Joyce, OBA #12728
Jessica John Bowman, OBA #30388
McAFFEE & TAFT
A Professional Corporation
1717 S. Boulder Ave. Suite 900
Tulsa, Oklahoma 74119
(918) 587-0000 Telephone
(918) 599-9317 Facsimile
gerald.hilsher@mcafeetaft.com
robert.joyce@mcafeetaft.com
jessica.johnbowman@mcafeetaft.com